IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                               Case No. 1:22-cr-2056-MLG

MICHAEL TRIBBLE,

    Defendant.

**MEMORANDUM OPINION AND ORDER
ON DEFENDANT'S SENTENCING OBJECTIONS**

    Michael Tribble pleaded guilty to providing false and fictitious statements to a federally licensed firearm dealer in contravention of 18 U.S.C. § 922(a)(6). *See* Docs. 2, 60. The grounds for his conviction are twofold. First, Tribble acted as a straw purchaser of a firearm for someone other than himself without declaring as such on the Alcohol, Tobacco, Firearms and Explosives ("ATF") form, Doc. 75-1, Doc. 62 at 5-6 ¶ 17. Second, when purchasing the weapon at issue, Tribble affirmed that he was not a user of illegal drugs (i.e., marijuana) but later admitted to ATF Special Agents that was not true. Doc. 62 at 5-6 ¶ 17; Doc. 83 at 26:14-15.

    In calculating the operative offense level for sentencing purposes, the United States Probation Office ("Probation") included a five-level enhancement to Tribble's base offense level pursuant to U.S.S.G. § 2K2.1(b)(5)(C). Doc. 62 at 9 ¶ 33. That provision applies, in relevant part, when the defendant intended to transfer two or more firearms to an individual and knew or had reason to believe that the recipient "was under a criminal justice sentence." U.S.S.G. § 2K2.1(b)(5)(C)(i)(II); *see* Doc. 62 at 8-9 ¶ 26, ¶ 33. Probation asserts that the enhancement is germane because Tribble knew the recipient of the firearms—an individual hereinafter referred to

1

as "M.A."—was under such a sentence. Doc. 62 at 8-9 ¶ 26. Tribble objects. He argues that there is insufficient evidence for Probation's position. Doc. 66 at 3.

The Government also seeks a five-level enhancement to Tribble's base offense level, albeit for different reasons than those Probation put forward. It asserts that Section 2K2.1(b)(5)(C)(i)(III) applies because Tribble knew or had reason to believe that M.A. intended to use or dispose of the weapons unlawfully. *See generally* Docs. 70, 82. Tribble also objects to this theory. He asserts that "the government cannot prove that common sense would dictate that [] Tribble had reason to know that [M.A.] would use the firearms for unlawful purposes." Doc. 81 at 6. Tribble also discounts his relationship with M.A. arguing it was not "the type of connection" that would provide a basis "to know that [M.A.] would use the firearms unlawfully once [Tribble] transferred them to [M.A.]." *Id*.

Having considered the parties' arguments, the Court grants Tribble's objections in part and overrules them in part. The United States has not shown by a preponderance of the evidence that Tribble knew or had reason to believe M.A. was under a "criminal justice sentence" at the times of the firearm transfers in May 2022 or on August 19, 2022. However, the Government has proven by a preponderance of the evidence that Tribble knew or had reason to believe that M.A. intended to use or dispose of the transferred firearms unlawfully. Consequently, the Court holds that Section 2K2.1(b)(5)(C)(i)(II) does not apply but Section 2K2.1(b)(5)(C)(i)(III) does. The Court's reasoning and analysis is explained below.

**FACTUAL BACKGROUND**[1]

**I.      Tribble's history and relationship with M.A.**

Tribble has known M.A. since high school, and in that time, the pair would frequent each other's homes, go to races, and Tribble would try to keep M.A. out of trouble. Def. Ex. A at 5:27-31, 27:09-20, 28:39-29:00 (discussing being M.A.'s "voice of reason"). Tribble is generally aware that M.A.'s actions are (at least) sometimes inconsistent with those of an average law-abiding citizen. For example, Tribble witnessed M.A. pistol whip a motorcyclist at a race. *Id.* at 27:45-51; Doc. 62 at 5 ¶ 15; Doc. 83 at 39:6-20. He also recalled that M.A. was arrested for allegedly breaking into a gun store in Rio Rancho, New Mexico. Def. Ex. A at 24:38-25:54. Further, in the months prior to his arrest, Tribble overheard several conversations wherein M.A. discussed criminal activity. For example, Tribble heard M.A. talk about taking firearms to Mexico and assumed that M.A. was smuggling weapons south due to conversations with M.A.'s associates and the ATF's involvement in Tribble's arrest.[2] *Id.* at 16:55-18:09 (explaining M.A.'s trips to Mexico).

Tribble was also aware that M.A. engaged in questionable firearms transactions. *See id.* at 25:20-38 (asking why M.A. had other people purchase him guns). Specifically, M.A. attempted to illegally purchase a fully automatic firearm and Tribble overheard M.A. bargain for similar weapons. *Id.* at 21:20-23:30 (discussing purchasing a "M60" or "M240" from the "military guy"

---

[1] The Court draws these facts from the Presentence Report ("PSR"), Doc. 62, and those established by evidence the parties admitted during the November 21, 2024, sentencing hearing, *see generally* Doc. 83. *See* Fed. R. Crim. P. 32(i)(3)(A) (the Court "may accept any undisputed portion of the presentence report as a finding of fact").

[2] The Court also heard testimony from ATF Special Agent Brenton Hutson that Tribble overheard conversation about filing off serial numbers of some of the firearms. Doc. 83 at 45:17-23 (testifying that Tribble explained the guns "go somewhere and then they get sent to Mexico," and hearing of someone who would file off serial numbers from guns). Yet, to Hutson's knowledge, no firearms Tribble purchased for M.A. were ever recovered. *Id.* at 48:8-14.

for $8,000 to $12,000 at the tire shop); Doc. 83 at 32:24-33:6 (discussing an "unlawful" purchase of a MP40 firearm without a tax stamp), 36:2-8 (Hutson testifying that he understood Tribble to overhear M.A. discussing prices on fully automatic versus semi-automatic firearms).

Tribble also generally knew that M.A. was involved in drug sales. He witnessed M.A. check-in on an associate's progress selling cocaine at a tire store. Def. Ex. A at 13:35-52 (discussing M.A. selling cocaine and his drug use), 19:09-20:10 (explaining M.A. selling cocaine three months prior from the tire shop). Tribble observed M.A. carrying a firearm during that interaction. *See id.* at 29:10-17.

Despite his knowledge of these illicit activities, Tribble provided M.A. with firearms. Based on information provided by Probation, the Government, and Tribble's subsequent admissions, the record shows that Tribble purchased at least six firearms for M.A. on four separate occasions between February 24, 2022, and August 19, 2022. *See* Doc. 62 at 5 ¶ 14, 6 ¶ 19, 7-8 ¶ 24; Doc. 83 at 14:23-24, 44:22-45:4 (Hutson describing Tribble's admissions in an unrecorded interview). Tribble also admitted to transferring two rifles to M.A. in May 2022. Def. Ex. A at 23:45-24:20, 30:53-32:37; *see* Doc. 62 at 6 ¶ 19, 8 ¶ 24 (documenting Tribble purchasing two firearms on May 23 and 24, 2022); Doc. 83 at 45:11-16 (describing May 24, 2022, purchase of at least one AK-47 Tribble transferred to M.A. alongside "Felipe").

M.A. and Tribble followed a similar pattern when conducting these firearm purchases and transfers: M.A. would contact Tribble about buying a firearm, pick Tribble up in a car that usually was not his own, show or describe the desired gun, drive to a firearm store, give Tribble money to purchase the weapon, park away from the store, and upon Tribble's return to the vehicle, pay

4

Tribble for each firearm purchased.[3] *See, e.g.*, Doc. 62 at 6 ¶ 19 (describing transfer at a tactical store with M.A. and an unidentified individual), 8 ¶ 24 (documenting Tribble's May 23, 2022, purchase of two rifles); Def. Ex. A at 30:18-45 (M.A. stated he "had a gift" for Tribble for finishing the August 19, 2022, job; Tribble previously received one-hundred dollars for buying a gun), 30:53-32:37 (describing driving to a tactical store in a Dodge truck belonging to "some Latino dude" to purchase firearms for M.A.).[4]

The offense conduct leading to Tribble's arrest was consistent with prior straw purchases. M.A. asked Tribble to purchase a Draco pistol, and then picked Tribble up at his home. Def. Ex. A at 2:19-50, 3:43-4:04, 8:33-9:10, 10:08-24. After switching cars at M.A.'s home, the pair drove to a tactical shop. *Id.* at 2:35-50. Once there, M.A. gave Tribble one thousand dollars and sent him inside to buy the weapon. *Id.* at 2:45-55; Doc. 62 at 5 ¶¶ 14-17, 6 ¶ 21. Tribble completed the purchase, including the completion of the requisite ATF Form 4473, Doc. 75-1, and was arrested as he left the store. *See* Doc. 62 at 8-9 ¶ 26. Tribble ultimately pled guilty to a single count of providing false and fictitious statements to a federally licensed firearm dealer contrary to 18 U.S.C. § 922(a)(6). Docs. 2, 60.

---

[3] The last time Tribble saw M.A. before his arrest was on May 24, 2022. *See* Def. Ex. A at 24:24-29 ("I haven't heard from him, since, until today"), 32:46-52 ("It's been the first time in three months since I've seen [M.A.] himself.").

[4] The May 2022 firearm purchases do not form the basis of Tribble's conviction, but they are relevant conduct the Court may consider when determining whether to apply the firearms trafficking sentencing enhancement. *See* U.S.S.G. § 1B1.3 (defining "relevant conduct"); U.S.S.G. § 2K2.1(b)(5)(C) cmt. n.13(A) (noting the term "defendant" in the enhancement "limits the accountability of the defendant to the defendant's own conduct and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused" in line with Section 1B1.3).

## II.      Procedural history

The parties' disputes regarding the applicability of Section 2K2.1(b)(5)(C)(i)(II) and Section 2K2.1(b)(5)(C)(i)(III) were addressed in court filings and during a hearing. *See generally* Docs. 66, 69-71, 81-83. To ensure the Court was fully apprised of Tribble's position, he was given leave to file supplementary briefing to address the Government's arguments. Doc. 83 at 61:25-62:4; 63:9-12; *see id.* at 59:2-15 (defense counsel describing his "disadvantage" based on the discrepancy between the PSR and the Government's arguments). There, in addition to arguing that he did not know or have reason to believe M.A. was under a criminal justice sentence, Tribble claimed he did not know or have reason to believe that M.A. intended to use or dispose of the transferred firearms unlawfully. Doc. 81 at 2. The United States maintains the Court should apply the enhancement given the relevant facts. *See generally* Docs. 70, 82.

## DISCUSSION

### I.      Tribble did not know or have reason to believe that M.A. was under a "criminal justice sentence."

Section 2K2.1(b)(5)(C)(i)(II) applies if a defendant, who trafficked two or more firearms, knew or had reason to believe that the transferee "was under a criminal justice sentence at the time of the offense." The guideline commentary expressly identifies six kinds of sentences that comprise a "criminal justice sentence" including "probation, parole, supervised release, imprisonment, work release, or escape status." U.S.S.G. § 2K2.1 cmt. n.13(A). As this text indicates, the Government must show by a preponderance of the evidence that M.A. was serving one of these punishments in late May 2022 and on August 19, 2022, and Tribble knew or had a reason to believe that was the case when he provided M.A. the firearms. *See United States v. Garcia*, 635 F.3d 472, 478 (10th Cir. 2011) (noting the Government must prove the facts supporting the enhancement by a preponderance of the evidence).

To substantiate application of the enhancement, the Government points to Tribble's statements regarding M.A.'s 2020 arrest for breaking into a gun store, law enforcement's subsequent search of M.A.'s home, the discovery of firearms and drugs, and that M.A. spent time in either jail or prison. Doc. 82 at 2; Def. Ex. A at 24:30-25:22; Doc. 83 at 38:2-5 (Hutson testifying about Tribble's belief that police found illegal firearms). However, Tribble's knowledge regarding M.A.'s arrest and the resulting punishment (if any) is inchoate. Tribble knew M.A. was no longer in custody after the alleged robbery, and he was surprised by the rapidity of M.A.'s release. *See* Def. Ex. A at 24:34-25:18. But the record is absent of any indication that Tribble knew whether M.A. was convicted for the offense or if he served a custodial sentence for that conviction. *See* Doc. 83 at 50:9-11, 16-21 (Hutson testifying as such). Moreover, while Tribble agreed with the Special Agents that M.A. "most likely" was not purchasing firearms for himself due to legal issues, Tribble was unaware of the specific details. *Id.* at 38:9-16; Def. Ex. A at 25:20-24. He told the Special Agents that he was unsure whether M.A. could not do so because he was either a felon or a drug user. Def. Ex. A at 9:30-37, 25:23-40.[5] Accordingly, the Government has not demonstrated that Tribble knew or had sufficient reason to believe that M.A. was under a criminal justice sentence during the relevant timeframe.

The Government also references federal drug crimes filed against M.A. in July 2020 in support of its claim that Section 2K2.1(b)(5)(C)(i)(II) applies.[6] Doc. 70 at 2; Doc. 82 at 2-3; *see*

---

[5] The Government has provided no proof of a conviction or other punishment related to the robbery. The PSR states that M.A. "was interviewed and advised he was actively on probation supervision," Doc. 62 at 8-9 ¶ 26, but there has been no evidence presented to validate this statement either. There is also no evidence showing Tribble knew that to be true.

[6] A criminal complaint filed on July 30, 2020, alleged M.A. aided and abetted in distributing cocaine and possessed or sold a stolen firearm to an undercover federal agent. *See generally* Doc. 82-1. According to the Government, M.A. was arrested for this on July 31, 2020, and pleaded guilty on July 14, 2021. Doc. 82 at 2 ¶ 2, 3 ¶ 4. M.A. has yet to be sentenced.

*also* Doc. 82-1. But again, there is nothing in the record to indicate that Tribble knew about those charges.

The record suggests that Tribble likely knew M.A. had been arrested previously, but that is not enough to justify the application of Section 2K2.1(b)(5)(C)(i)(II). As Tribble reminds the Court, "an arrest is not a conviction." Doc. 71 at 2. And the Government has proffered no evidence proving that M.A. was actually convicted of any crime or that he was serving a "criminal justice sentence" either in May 2022 or on August 19, 2022. For these reasons, the Court sustains Tribble's objection as to application of Section 2K2.1(b)(5)(C)(i)(II).

II.     **Tribble knew or had reason to believe that M.A. intended to use or dispose of the transferred firearms in an unlawful manner.**

Section 2K2.1(b)(5)(C)(i)(III) applies if a defendant obtained two or more firearms with intent to transfer them "knowing or having reason to believe that such conduct would result in the receipt of the firearms by an individual who . . . intended to use or dispose of the firearms unlawfully." As to this enhancement, Tribble concedes that he was aware of M.A.'s propensity for unlawful conduct, that M.A. had in fact engaged in criminal activity, and that he had observed M.A. committing crimes. Doc. 81 at 3. *See, e.g.*, Def. Ex. A at 11:18-32 (Tribble explaining that M.A. was the reason Tribble got a firearm because "he's the type to lash out on like anybody in the vicinity"), 13:35-13:52 (discussing M.A.'s cocaine dealing), 16:47-18:09 (discussing M.A. taking guns to Mexico), 19:11-20:15 (explaining M.A. dealing cocaine from a tire shop), 21:20-23:10 (relaying M.A.'s attempt to purchase fully automatic weapons at a tire shop), 24:35-25:18 (explaining M.A.'s alleged gun store robbery), 27:09-20 (describing M.A. pistol whipping a motorcyclist), 28:16-29:17 (Tribble stating M.A. said he would "shoot anybody," Tribble tried to be the "voice of reason," and talking about M.A. possessing a weapon while dealing cocaine).

However, Tribble argues that the Government has not shown he possessed such knowledge before being arrested. Doc. 81 at 2-3, 6.

Despite his protestations to the contrary, there is ample evidence that Tribble was aware of M.A.'s criminal activity and that he had knowledge of that illicit conduct well before the events giving rise to this matter.

Tribble knew that M.A.'s criminal conduct often involved firearms. As Tribble explained it, he had seen M.A. "with plenty of guns." Def. Ex. A at 11:13-15; *see id.* at 11:01-10 (stating M.A. "usually" had a gun). Those observations occurred prior to his arrest. For example, Tribble witnessed M.A. pistol whip a person sometime in 2020 or 2021. *See* Doc. 83 at 39:6-16; Def. Ex. A at 10:48-59 (Tribble stating he did not want the pistol to go into M.A.'s hands because "I know for a fact, at least, I have seen him pistol whip a few people at the races."), 27:09-28:10 (M.A. knocked a motorcyclist's helmet off while striking him and "otherwise was going to shoot him"). There were also moments when Tribble discouraged M.A. from shooting others when he was frustrated. *See* Def. Ex. A at 28:16-29:00. Again, this occurred prior to his arrest.

Further, Tribble knew that M.A. would regularly carry a firearm between 2020 and 2022, and he observed M.A. in possession of a gun while selling cocaine. *Id.* at 29:00-17 (Tribble seemingly joking about the absurdity of the Special Agents asking whether M.A. carried a firearm during drug deals). *See, e.g.*, *United States v. Mitchell*, 328 F.3d 77, 83 (2d Cir. 2003) (upholding application of the enhancement because the defendant knew the transferee "was a drug dealer who owned guns and regularly carried guns himself"). Moreover, Tribble accompanied M.A. when he attempted to purchase fully automatic firearms, Def. Ex. A at 21:20-23:30, and he also witnessed him visit one of his cocaine dealers and had a gun. *Id.* at 29:10-17. Tribble also overheard M.A discuss supposedly smuggling firearms to Mexico. *Id.* at 16:55-18:15. Around this same period,

on May 24, 2022, Tribble saw M.A. for the last time before his arrest on August 19, 2022. *See id.* at 24:23-27 (speaking with the Special Agents, Tribble indicated he "hadn't heard from [M.A.] since [May 24, 2022,] until today"), 32:46-52 (during his arrest Tribble stated, "It's been the first time in three months since I've seen [M.A.] himself.").

The frequency and covert nature of the pair's firearm exchanges, in combination with Tribble's knowledge of M.A.'s criminal conduct, adds additional support for application of the enhancement. *See, e.g.*, *Garcia*, 635 F.3d at 479 (affirming the district court's application of the enhancement based in part on "evidence of the clandestine relationship involved in [the defendant]'s firearm purchases" including being "dropped off some distance from the gun store," being "furtively directed to buy four AK-47 type weapons," and that "someone else was funding [the defendant]'s gun shopping spree"); *United States v. Mena*, 342 F. App'x 656, 658 (2d Cir. 2009) (finding no clear error when the district court applied the enhancement where the defendant "twice delivered guns in a plastic bag in exchange for cash on a street in Manhattan."). Indeed, Tribble participated in a clandestine pattern of straw purchasing and obliged M.A.'s repeated requests despite knowing that M.A. "most likely" could not purchase a firearm himself. Def. Ex. A at 25:20-24; Doc. 83 at 44:25-45:4 ("In a subsequent interview Mr. Tribble admitted to four separate transactions in which he purchased firearms for . . . M.A."). Tribble also knew that M.A. attempted to acquire firearms from other people. *See* Def. Ex. A at 24:34-37 (the Special Agents asking why others buy guns for M.A.), 25:20-22 (same), 26:08-22 (M.A. asked Tribble's girlfriend and "the military guy" to buy guns for him); Doc. 83 at 36:2-5 (Hutson characterizing Tribble's statements as such). Given these facts, the only common-sense conclusion is that Tribble knew or had reason to believe that his covert straw purchases and subsequent transfers of firearms to M.A. would result in M.A.'s intent to unlawfully use or dispose of them. *See United States v. Crockett*,

779 F. App'x 536, 538, 540 (10th Cir. 2019) (concluding the district court did not commit clear error when applying the enhancement because "common sense" suggested that distribution of firearms to members of "a well-known gang that's involved in a lot of criminal activity" meant Crockett "knew or should have known" that his fellow gang members intended to unlawfully use or dispose of the stolen firearms).

In light of the preceding, the Court concludes Tribble knew or had reason to believe that M.A. would use or dispose of the purchased firearms unlawfully. Both the relevant facts and common sense support that conclusion.

## CONCLUSION

In sum, Tribble knew generally that M.A. was engaged in criminal activity. He nevertheless straw purchased multiple firearms then transferred those weapons to M.A. But mere awareness of unlawful conduct is insufficient grounds to justify a five-level enhancement under Section 2K2.1(b)(5)(C)(i)(II), and the United States has failed to provide evidence that Tribble knew or had reason to believe M.A. was under a "criminal justice sentence" during the May 2022 and August 19, 2022, firearm transfers. The Government has shown, however, by a preponderance of the evidence that Tribble knew or had reason to believe that M.A. intended to use or dispose of the transferred weapons unlawfully. For these reasons, as detailed above, Tribble's objection to the five-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(5)(C)(i)(II) is granted and his objection to U.S.S.G. § 2K2.1(b)(5)(C)(i)(III) is overruled.

It is so ordered.

UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA